**STATE of Minnesota, Plaintiff (C1–95–531), Appellant (C5–95–564),**

v.

**Randy Charles HANSON, Defendant (C1–95–531),**

**Joseph Michael Burns, Respondent (C5–95–564).**

**Nos. C1–95–531, C5–95–564.**

Court of Appeals of Minnesota.

June 13, 1995.

Review Granted Aug. 9, 1995.

---

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas D. Hayes, Sherburne County Atty., Thomas C. McNinch, Asst. County Atty., Elk River, Elliott B. Knetsch, Andrea M. Poehler, Campbell, Knutson, Scott & Fuchs, Eagan, for State.

Donald H. Nichols, John A. Fabian, Paul J. Lukas, Nichols, Kaster & Anderson, Minneapolis, for Randy Charles Hanson.

Samuel A. McCloud, Kelly Vince Griffitts, Chanhassen, for Joseph Michael Burns.

Considered and decided by RANDALL, P.J., TOUSSAINT, C.J., PARKER, CRIPPEN, KALITOWSKI, HARTEN and SCHULTZ,* JJ.

## OPINION

PARKER, Judge.

These consolidated appeals raise the legal issue of the application of the Double Jeopardy Clause to an implied consent driver's li-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

cense revocation. Each arises from a DWI prosecution in which the defendant moved to dismiss, claiming the prior implied consent revocation was "punishment" barring further punishment. In the Hanson case (C1–95–531), the trial court denied the motion but certified the question to this court. In the Burns case (C5–95–564), the trial court granted the motion to dismiss. Although the court certified the question, the state has chosen to appeal. We answer the certified question, in Hanson, in the negative, and reverse in Burns.[1]

## FACTS

### Hanson

Hanson was stopped in Sherburne County on November 12, 1994. He agreed to take a breath test but ultimately gave a urine test. When the test result showed an alcohol concentration of .17, Hanson's driver's license was revoked under the implied consent statute. Although the length of the revocation is not specified in the file, we infer it to have been for 90 days.[2] Hanson was charged with driving while under the influence, driving with an alcohol concentration of .10 or more, and driving with an alcohol concentration of .10 or more within two hours. The trial court denied Hanson's motion to dismiss the complaint on double jeopardy grounds, but certified the question as important and doubtful.

### Burns

Burns was stopped by Lakeville police on June 19, 1994. He agreed to submit to a breath test, which showed an alcohol concentration of .15. His license was revoked for 90 days under the implied consent statute. The district court sustained the revocation. Burns was charged with driving while under the influence, driving with an alcohol concen-

tration of .10 or more, and driving with an alcohol concentration of .10 or more within two hours. The trial court granted Burns's motion to dismiss the complaint on double jeopardy grounds, and certified the question. The state also filed a notice of appeal.

## ISSUE

Is an implied consent driver's license revocation "punishment" for purposes of the Double Jeopardy Clause so as to bar a subsequent DWI prosecution?

## ANALYSIS

■ The Double Jeopardy Clause protects against multiple punishment as well as successive prosecution. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The trial court found in *Burns*, and the appellant argues in *Hanson*, that the implied consent driver's license revocation, although nominally a civil sanction, is "punishment" for purposes of the Double Jeopardy Clause protection against multiple punishment. *See United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

The United States Supreme Court in *Halper* stated its holding as follows:

> We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 448–49, 109 S.Ct. at 1902.

■ The Supreme Court thus held in *Halper* that, for purposes of the double jeopardy guarantee against multiple punishment

1. The parties have neither briefed nor argued that the state appeal has rendered moot the trial court's certification, and, consequently, we do not address the question.

2. This court, on its own initiative, has supplemented the criminal file with the record of the implied consent proceeding. *See* Minn.R.Civ. App.P. 110.05. That record does not state the period of revocation, but shows that the implied

consent revocation effective December 25, 1994, was stayed by a January 13, 1995, order and rescinded by an April 13, 1995, order. There is no indication in either the DWI or implied consent file that Hanson has a previous license revocation. Therefore, we must assume that his implied consent license revocation was to be for 90 days, before it was stayed and later rescinded. *See* Minn.Stat. § 169.123, subd. 4 (1994).

for the same offense,[3] a civil sanction may constitute "punishment" if it can only be characterized as punitive. *Id.* A civil sanction that does not bear a "rational relation" to a nonpunitive purpose will be treated as "punishment." *Id.* at 449, 109 S.Ct. at 1902.

■ The defendants in these appeals argue that a civil sanction is "punishment" under *Halper* unless it can "fairly be said solely to serve a remedial purpose." *Id.* at 448, 109 S.Ct. at 1902. But this statement is not the explicit holding of *Halper*, which is quoted in full above. Moreover, this "solely remedial" language is derived from a broader analysis of the civil-criminal distinction for purposes of due process. *See Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). That analysis does not apply in determining whether a civil sanction is "punishment." *Austin v. United States,* — U.S. —, — n. 6, 113 S.Ct. 2801, 2806 n. 6, 125 L.Ed.2d 488 (1993).

The defendants argue that the Supreme Court in *Austin v. United States* pointed to the "solely remedial" language as the holding of *Halper. See id.* at —, 113 S.Ct. at 2812. But *Austin* involves the Excessive Fines Clause of the Eighth Amendment, not the Double Jeopardy Clause. In a more recent opinion that does involve double jeopardy, the Court has referred to the explicit *Halper* holding (quoted in full above) as the holding of that case. *Department of Revenue of Montana v. Kurth Ranch,* — U.S. —, —, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994).

The defendants in these appeals concede, as the Supreme Court noted in *Halper,* that even criminal penalties may serve remedial goals. *See Halper,* 490 U.S. at 447, 109 S.Ct. at 1901. In order to determine whether the implied consent driver's license revocation is "punishment" for double jeopardy purposes, *Halper* requires

a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve.

*Id.* at 448, 109 S.Ct. at 1901.

Driver's license revocations under the implied consent statute have historically been understood as remedial, imposed for the protection of the public. *See, e.g., State v. Juncewski,* 308 N.W.2d 316, 319 (Minn.1981); *State v. Dahlheimer,* 413 N.W.2d 255, 257 (Minn.App.1987). Drug forfeitures, in contrast, have historically been understood as punishment. *Austin v. United States,* — U.S. at —, 113 S.Ct. at 2812. The trial court in *Burns* therefore erred in equating driver's license revocations with drug forfeitures for purposes of the *Halper* analysis.

Under the implied consent statute, a driver's license may be revoked for a period ranging from 90 days for a first-time offender who fails the test, to one year for a person who refuses to submit to testing. Minn.Stat. § 169.123, subd. 4 (1994). But we address only the particular sanctions assessed in this case. Both of the defendants suffered implied consent driver's license revocations of 90 days.

■ The only issue before us, then, is whether the 90–day driver's license revocations suffered by the defendants are "punishment" for purposes of the Double Jeopardy Clause. Although briefed and argued for persuasive weight before this special panel, the 180–day license revocation for certain repeat offenders and the one-year revocation for those who refuse the test are not before us, *see* Minn.Stat. § 169.123, subd. 4, and are irrelevant to our determination of these cases. This court does not issue advisory opinions or indicate probable views even on issues clearly on the horizon.

■ The implied consent driver's license revocation provision serves public safety by removing drunken drivers from the highways pending the judicial hearing. *See, e.g., Heddan v. Dirkswager,* 336 N.W.2d 54, 63 (Minn.

---

3. The state argues that the implied consent revocation and the DWI are not the "same offense" under the *Blockburger* "same elements" test. *See generally United States v. Dixon,* — U.S. —, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993). In view of our determination on the *Halper* issue, however, we need not address this issue. Neither is it necessary to address the state's arguments that the implied consent and DWI are a single coordinated proceeding and that *Halper* applies only when the criminal punishment precedes the "civil" sanction.

1983) (compelling interest in highway safety justifies revocation pending judicial hearing). A driver receives a temporary seven-day license when he or she refuses testing or fails the test. Minn.Stat. § 169.123, subd. 5a(c)(1) (1994). There is then a 15–day waiting period before any limited license is available. *Id.* § 171.30, subd. 2a(1) (1994).

Defendants cite *Friedman v. Commissioner of Pub. Safety,* 473 N.W.2d 828 (Minn. 1991), in which the supreme court noted that driver's license revocation "has, in most instances, the same impact as the traditional criminal sanctions of a fine and imprisonment." *Id.* at 832. But *Friedman* addresses the nature of implied consent in the context of the right to counsel, not double jeopardy. Under *Halper,* this court is not to look at the revocation "from the defendant's perspective" because "even remedial sanctions carry the sting of punishment." *Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7.

The defendants in these appeals argue that the implied consent revocation is not remedial because the driver is still allowed to drive for a limited time. But this hardship relief is provided to alleviate due process concerns. *See Davis v. Commissioner of Pub. Safety,* 517 N.W.2d 901, 904–05 (Minn.1994). It does not defeat the remedial purpose of the statute.

The implied consent revocation, although temporary, generally occurs long before the driver could be criminally prosecuted and sentenced. The defendants in these appeals argue that the driver may nevertheless ignore the revocation and continue driving. It is the function of the legislature, however, not of this court, to devise provisions that might increase the effectiveness of the implied consent statute. *See generally Essling v. Markman,* 335 N.W.2d 237, 239 (Minn. 1983) (court will not substitute its judgment for that of legislature).

The 90–day license revocation suffered by these defendants is certainly not "overwhelmingly disproportionate" to the public safety interest at stake. *Halper,* 490 U.S. at

449, 109 S.Ct. at 1902. A "particularized assessment of the penalty imposed" compels this conclusion. *Id.* at 448, 109 S.Ct. at 1901. Neither the character of the implied consent sanction, a driver's license revocation, nor the 90–day length of the sanction in this case prevents it from being "fairly * * * characterized as remedial." *Id.* at 449, 109 S.Ct. at 1902.[4] Part of defendants' argument, indeed, is that the statute is not sufficiently remedial because it does not disable the driver for a sufficiently lengthy period. They argue that a truly remedial statute would remove the drinking driver from the highway long enough to cure his or her drinking problem. We disagree that only such a statute would be remedial. Although the legislature, subject to constitutional limitations, could enact more stringent measures, the 90–day revocation period is "rationally related" to its legislative purpose of protecting public safety. *Id.* at 451, 109 S.Ct. at 1903.

### DECISION

The question certified by the trial court in *Hanson,* asking whether the implied consent driver's license revocation is "punishment" for purposes of the Double Jeopardy Clause, is answered in the negative. The trial court in *Burns* erred in dismissing the complaint on double jeopardy grounds.

**Certified question (C1–95–531) answered in the negative.**

**Reversed (C5–95–564).**

RANDALL, Judge (concurring specially).

I join in Judge Crippen's concurrence and I write separately on the only real issue presented: "When is a civil or remedial penalty, by whatever name called, deemed enough substantive punishment that the double jeopardy clause forbids its use if the intended recipient has previously been punished for the same offense?"

This issue and the subsequent challenges arising around the entire country to a criminal DUI trial with its attendant punishment

---

**4.** The defendants cite other provisions, such as the use of the implied consent revocation to enhance a DWI offense and the criminalization of refusal. *See* Minn.Stat. § 169.121, subds. 1a,

3(a)(2) (1994). But those provisions are not applicable in this case, and the issues they may present are not before us.

when the driver has already been subject to implied consent proceedings had its genesis in *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

In *Halper*, the defendant had previously been subjected to a criminal prosecution for 65 different counts of attempting to defraud Medicare. The amount of money involved in the total number of counts was trivial. The false Medicare claims totalled just $585. *Id.* at 437, 109 S.Ct. at 1896.

After the criminal prosecution, the federal government went after the defendant for monetary sanctions of $2,000 per count, or a total of $130,000 under the civil False Claims Act. The Supreme Court noted that the issue before it was the double jeopardy protection against multiple punishment. *Id.* at 440, 109 S.Ct. at 1897. The Supreme Court ruled for the defendant and found that by no matter what name called, a civil sanction of $130,000 where the total claimed fraud was $585, could not honestly be characterized as anything but punishment or retribution. *See id.* at 452, 109 S.Ct. at 1904.

The *Halper* court held

that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 448–49, 109 S.Ct. at 1902.

This is not to say that whether a sanction constitutes punishment must be determined from the defendant's perspective. On the contrary, our cases have acknowledged that for the defendant even remedial sanctions carry the sting of punishment. * * * Rather, we hold merely that in determining whether a particular civil sanction constitutes criminal punishment, it is the purpose actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated.

*Id.* at 447, n. 7, 109 S.Ct. at 1901, n. 7 (citation omitted). The *Halper* court also announced

a *rule for the rare case, the case such as the one before us,* where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused. The rule is one of reason: Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as "punishment" in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment.

*Id.* at 449–50, 109 S.Ct. at 1902 (emphasis added).

Although *Halper* involved a setting where the criminal case came first and then the civil sanction, from the totality of the cases discussing the issue I conclude that the order is not significant. Put another way, the issue arises whether the civil comes first, as it does with implied consent, and the criminal second, or as in *Halper*, criminal first, civil second.

It is clear enough to me from reading *Halper* and *Kurth Ranch* that the Supreme Court meant to use the phrase, *"is a rule for the rare case, the case such as the one before us." Id.* at 449, 109 S.Ct. at 1902 (emphasis added).

The overreaching by the government in imposing $130,000 civil sanction on a criminal defendant accused of stealing $585 led to the result in *Halper*. Federal and state law enforcement agencies hate *Halper* because it has spawned the "Halper defense" across the country, in virtually every jurisdiction, in hundreds, soon to be thousands of drug forfeiture cases, other crimes involving forfeiture statutes, and drunk driving cases. But the government is stuck with it because they called it on themselves. I suggest that if some bureaucrat had made the decision to only fine Halper $2,000 or $3,000, or imposed no fine at all (they didn't have to impose any to make a point—he had already been punished criminally), we would not be here today. The history behind any change in gov-

ernment, whether the change is effected peacefully or forcefully, can be traced to government overreaching and arbitrary conduct towards its citizens. Our own country, formed in a violent overthrow of existing government 220 years ago, did not take place because the colonists were the recipients of fair bail settings, the right of peaceful assembly, homes left intact unless accompanied by a proper search warrant, and reasonable taxes on tea and coffee. Halper and its progeny make clear that regardless of federal or state legislative labels, civil "remedial sanctions" will be examined behind the wording to see if their true aim is to punish the offender.

I concur with the result reached by the majority because in the present application of our implied consent punishment upon drivers, although I agree with those who would say we are getting close to the breaking point, I do not, at least for now, see such a harsh and excessive punishment that Minnesota's dual system of implied consent/DUI should be struck down on the spot. But like the concurrence of Judge Crippen, I see our dual system creaking at its joints from the strain. I conclude the mantra of the state, that implied consent is remedial and therefore not double punishment, has to be disregarded if we are to remain honest with our citizens. In truth, the so-called remedial sanctions do their job of "remediating" by punishing drivers. The history behind the legislative enactments, the rhetoric from citizens concerned about drunk driving, and from the law enforcement agencies charged with guarding our roads makes it clear that the civil penalties were imposed and then ratcheted up to teach drivers that if you drive intoxicated (or .10), you will be punished, to teach you a lesson not to do it again, and we want that lesson to be spread to other drivers. This is not to say that those who drive under the influence should not be punished for what they have done and to send a message to others, but this is to say that if the remediation were not punishment, its lessons would not stick. This is all too well known to the designers of the civil implied consent statutes, and to the designers of the unbroken string of enhancements of implied consent punishment the last decade.

The better, and the more honest argument, is that across this entire country there are thousands of civil sanctions/punishments that are imposed in virtually every walk of life and yet do not automatically bar any later criminal prosecution, unless the Halper rare case test of excessive and harsh retribution is met.

The countless federal and state agencies that monitor work place rules, OSHA, clean air and water standards, environmental concerns, professional conduct, etc. invariably have within their power the ability to fine, suspend, disbar and shut down people or entities that run afoul of a civil law. If all such civil punishment, and I will call them punishments, led to an absolute bar to any later criminal prosecution when the facts warranted, it would lead to wholesale confusion and likely a monstrous result. For modest infractions, the government might choose to start charging all its citizens criminally, for fear it would be barred later.

An example would be school discipline. Right now, if a student brings a gun or a knife to school, suspension or complete expulsion is likely. As it exists today, the state has the ability, but doesn't have to use it, to charge criminally if the facts warrant. The predicted suspension or expulsion is, by no stretch of the imagination, remedial. If it was truly remedial, the last thing you would want to do is drive the student from the school. Rather you would want to keep him or her in class and under the control of the teachers and attempt to help that student find the error of his ways. But it is fairly uniform today, and arguably with good reason, that the bringing of a gun or a knife to school, will lead to suspension or perhaps being permanently expelled. That is pure punishment, meant to be pure punishment and meant to punish people for a bad act. Under a broad theory of Halper, any suspension/expulsion by the school would lead to a bar of all later criminal action. We would not want a situation where law enforcement would direct a school not to do a thing to that student so they could later bring criminal charges if they could investigate and muster the facts to convince a magistrate that probable cause for a criminal trial existed (I ac-

knowledge the difference in the mechanics between juvenile court and criminal court, but the issue and the underlying principles remain the same).

I cannot read into *Halper, Kurth Ranch,* and the other cases both parties cite, a broad sweeping holding so that the *Halper* court meant to knock out every implied consent statute, and every agency and governmental sanction around the country, in those tens of thousands of cases, including, but not limited to, drunk driving. I can read into *Halper* a warning to state and federal agencies responsible for law enforcement that when you overreach with your civil punishment, you will be limited to that punishment, and a later chance to punish criminally will be barred. As stated above, I conclude the result remains the same, whether the civil or criminal punishment comes first. If the punishment is excessive, and if retribution is its chief purpose, even a collateral claim of remediation will not save it.

Minnesota is approaching the breaking point. You are punished under the implied consent law for not taking the test, and punished under the implied consent law for taking the test and producing a .10 or more reading. You are punished criminally for the exact same things. You are punished criminally for refusing to take the test, and punished criminally for taking the test and producing a .10 or more. I reject the state's argument that there is no "single behavioral" bar, that there is a different element in implied consent and drunk driving, and therefore punishment in one does not bar punishment in the other. I do not see even a remote argument that they are for two different offenses. Both the civil and the criminal punishments are visited on the driver for the same conduct committed in the same car, on the same day, at the same time and place.

I also reject the state's argument that there is no bar to double punishment because the civil implied consent hearing and the drunk driving criminal case are part of one single coordinated proceeding, and therefore since they are the same, they cannot be double, and therefore both punishments can be had. This is the state's weakest defense. The two proceedings are separate as a matter of law; one only before a judge (implied consent administrative law), and one on a different date with a different judge or jury (DUI-criminal law), different penalties and different standards of proof. Attorneys for the drivers argue persuasively that the safest and most constitutional course for the state to take is to combine implied consent and drunk driving into one proceeding. If the driver is found guilty, a suspension of license and a fine could accompany a jail sentence. Today, following a guilty verdict in a criminal trial, the judge has an ability to impose as part of the same sentence imprisonment and/or probation, monetary fines, and the loss of certain privileges. The drivers concede this can be done. They simply insist it has to be done in *one* proceeding, whether called civil or criminal.

I conclude that implied consent punishment and drunk driving criminal punishment are a form of double punishment, but that Minnesota's practice has, at least for now, gotten close to, but not past, the *Halper* breaking point of substantial punishment, deterrents, and retribution, with remediation barely hanging on as an afterthought.

CRIPPEN, Judge (concurring specially).

Our analysis of the character of implied consent proceedings in this case represents a holding of first impression in Minnesota. Prior decisions have recognized the remedial purpose of this sanction, but only in the context of a larger due process analysis, where it was not necessary to examine the punitive characteristics of revocation. *Heddan v. Dirkswager,* 336 N.W.2d 54, 62–63 (Minn.1983). In such a limited context, the supreme court has also recognized the remedial purposes of our criminal laws. *Melby v. Commissioner of Public Safety,* 367 N.W.2d 527, 528 (Minn.1985) (recognizing the remedial purpose of Minn.Stat. § 169.121, the criminal statute on driving under the influence). As *Halper* demonstrates, a decision in the case before us requires that we engage in "a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Halper,* 490 U.S. at 448, 109 S.Ct. at 1901. "Simply put," we must determine whether "the sanction as

applied in the individual case serves the goals of punishment." *Id.* at 448, 109 S.Ct. at 1901–02.

I concur in the conclusion that the 90 day revocations of Joseph Burns and Randy Hanson do not fall within the narrow prescription of *Halper.* These revocations can "fairly be characterized as remedial", and not only as a "deterrent or retribution." *Id.*, at 449, 109 S.Ct. at 1902. Significantly, unlike the civil penalties that were permitted in part and upset in part by the court in *Halper,* we are dealing with an indivisible sanction, the revocation of driver licenses. Looking at the revocation overall, its dominant effect may fairly be said to be the remedial purpose of keeping unsafe drivers off the highways.

But our analysis of the predominant purpose for license revocations should not minimize the punitive characteristics of current revocation law and should not cloud the tenuous nature of our decision to spare these penalties from the attack on double jeopardy grounds. License revocation has always had characteristics of punishment, and a continuing series of amendments make it evident that this purpose is expanding.

The trial court in *Burns* and both drivers have presented abundant indications of punitive purposes lying behind the revocation statute. Some of these are especially important. So, for example, it is significant that the Minnesota Supreme Court, even while reciting the prospect for keeping unsafe drivers off the road, recognized the equally important purposes of revocation law to deter drunken driving and to induce consent for chemical tests. *Heddan,* 336 N.W.2d at 62. Also, the Minnesota Supreme Court has found that in most instances, revocation remedies have "the same impact as the traditional criminal sanctions of a fine and imprisonment." *Friedman v. Commissioner of Public Safety,* 473 N.W.2d 828, 832 (Minn.1991). "Impact" is both imposed and felt. We go well beyond the driver's perspective to recognize that a sanction that resembles imprisonment serves a legislative aim to punish. *See Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7 (denying that the analysis of remedial and punitive purposes must be made from the defendant's perspective).

Periodic amendments have served to increase the punitive character of the implied consent statute. Pertinent to application of the statute in these cases, the legislature in 1992 provided that limited licenses could not be granted for the first 15 days of a revocation period. 1992 Minn.Laws, c. 570, Art. 1, § 23; Minn.Stat. § 171.30, subd. 2a(1) (1994). The trial court in *Burns* cited legislative history showing that the 15 day "hard revocation" provision was part of an effort to crack down on violators. The trial court also referenced an administrator's testimony before the legislature that the amendment would make sure violators suffered a deterrent.

There is a tendency in analyzing this case to look at *Halper* as a new legal development, and to ask how it affects Minnesota's historic effort to employ driver license revocations as a means to improve public safety. But there is nothing new about *Halper;* the case represents a fundamental part of American law. The newer development is the proliferation of multiple penalties, sometimes oblivious to the basic protection against double jeopardy. In the instance of Minnesota's efforts to deal with drunken driving, a legislative choice for more severe sanctions has been evident in the implied consent laws at least as much as in amendments of the governing criminal statutes.

Zeal for the revocation remedy creates the risk that we have already erred in approving the current 90 day revocation, and that the implied consent law may be even more vulnerable to double jeopardy scrutiny in its other applications or in the event of still further amendments. It is certainly for the legislature to decide the severity of penalties for dangerous misconduct, but their prerogative may depend on the choice to put all penalties in a single package, rather than a series of sanctions for the same conduct. *See Halper,* 490 U.S. at 450, 109 S.Ct. at 1903 (noting that the Court's decision did not preclude the government from seeking and obtaining both civil and criminal penalties in the same proceeding.)